UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BP PRODUCTS NORTH AMERICA,

    Plaintiff,

v.                                                               Case No. 04-70624

HAIDAR VAN DYKE, LLC,                    HONORABLE AVERN COHN

    Defendant.

_____/

**MEMORANDUM AND ORDER**
**GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

I.  Introduction

This is a commercial dispute between a franchiser and franchisee. Plaintiff BP Products North America ("BP") is suing defendant Haidar-Van Dyke, LLC ("Haidar") claiming breach of the parties' agreements under which BP's predecessor in interest, Amoco Oil Company, conveyed property and supplied gasoline to Haidar.

Before the Court is BP's motion for a summary judgment seeking a judgment in the amount of $182,168.34 based on a breach of the parties' agreements. For the reasons that follow, the motion is GRANTED.

II.  Background

The material facts as gleaned from the parties' papers follow.

A.

In January 2001, the parties executed a series of documents in which Haidar purchased the property at issue located at I-94 and Van Dyke (known as station #202)

in order to operate a BP franchise. On January 4, 2001, Haidar completed an Offer to Purchase (Offer) for $295,000.00 with a down payment of $5,000.00 and $290,000.00 at closing. BP accepted the Offer on January 17, 2001. The Offer contains the following provision:

> RESTRICTIONS. The Property shall be conveyed by Seller and accepted by Buyer subject to a restriction and covenant set fort in the Deed prohibiting, for a period of fifteen (15) years from the date the Deed is recorded, the use of the Property in whole or in part, directly or indirectly, for automobile service station, convenience store, car wash, automobile repair purposes, or for the sale, offering for sale, storage or distribution of any gasoline, motor vehicle fuels, lubricants, tires, batteries, automotive parts and accessories, other petroleum products or convenience store items. Such restriction and covenant of Buyer shall run with the Property for the benefit and protection of any adjoining property of Seller and/or other property of Seller used and operated by Seller or its representatives for such purposes within a distance of five (5) miles from the Property, whether owned or lease by Seller or its representatives during said fifteen (15) year period. Such restriction and covenant shall not, however, prohibit the storage or motor fuels, lubricants, other petroleum products or convenience store items on the Property solely for the use or consumption by Buyer or other occupants of the Property. **Notwithstanding the foregoing, so long as Buyer is (a) complying with all terms of the Supply Agreement, the Supplemental Agreement (and any Mortgage), this Agreement and any other agreement between Seller and Buyer, and (b) operating the Property pursuant to all such terms, Seller conditionally waives its right to enforce the use restriction contained in this Section 4**. This provision shall survive closing.

(Emphasis added). In addition to the Offer, the parties executed the following documents: (1) a Supplemental Agreement, (2) a Covenant Deed, and (3) a Dealer Supply Agreement. Under the Covenant Deed, BP conveyed the property to Haidar. The Covenant Deed contains the following provision:

> **USE RESTRICTION**. This conveyance is made by Grantor and accepted by Grantee upon the express condition and subject to the restriction and covenant that the Property shall not be used in whole or in part, directly or indirectly for a period of fifteen (15) years from the date this Deed is

> recorded, for automobile service station, convenience store, car wash, automobile repair purposes, or for the sale, offering for sale, storage or distribution of any gasoline, motor vehicle fuels, lubricants, tires, batteries, automotive parts and accessories, other petroleum products of convenience store items.  Such restriction and covenant of Grantee shall run with the Property for the benefit and protection of any property used and operated by Grantor, its parents, affiliates or subsidiaries, or their respective representatives for such purposes within a distance of five (5) miles from the Property, whether owned or leased by Grantor, its parents, affiliates or subsidiaries, or their respective representatives during said fifteen (15) year period.  Such restriction and covenant shall not, however, prohibit the storage of motor fuels, lubricants, other petroleum products or convenience store items on the Property solely for the use or consumption by Grantee or other occupants of the Property.

Under the Dealer Supply Agreement, BP and Haidar entered into a petroleum marketing franchise relationship and Haidar had the right to purchase BP gasoline and to resell it to the public using BP's "trade names, trademarks, service marks, logos, brand names, trade dress, trade design scheme, insignia, color schemes, and the like."

Under the Supplemental Agreement, Haidar agreed that upon the occurrence of certain events, Haidar would be liable to BP.  The Supplemental Agreement provides in relevant part:

> 1. ... The parties agree that upon the occurrence of either of the events set forth in Paragraph 3 hereof, Dealer [Haidar] shall liable [sic] to Seller [BP] for an amount of money as determined in Paragraph 2 hereof (the "**Supplemental Amount**").
>
> 2. The initial Supplemental Amount is equal to One Hundred Eighty-nine Thousand and no/100 U.S. Dollars ($189,000.00) as of the date hereof.  The initial Supplemental Amount shall be reduced by Dealer's operation of the Station as a branded service station pursuant to the Dealer Supply Agreement and any renewal Dealer Supply Agreements over a period of ten (10) years from the date hereof, or by purchasing Nine Million (9,000,000) gallons of gasoline from Seller under the Dealer Supply Agreement, whichever occurs later.  Therefore, to determine the amount by which the initial Supplemental Amount set forth above has been reduced at any given time, the lower of the following will apply:

    (a)    The cumulative total of One Thousand Five Hundred Seventy-Five and no/100 U.S. Dollars ($1575.00) per month from the date hereof to the date of determination; or

    (b)    The sum obtained by multiplying the initial Supplemental Amount set forth above by the following fraction: the numerator shall be the number of gallons of gasoline purchased by the Dealer from Seller for supply to the Station from the commencement of the Dealer Supply Agreement to the date of determination, and the denominator shall be the number of gallons set forth in paragraph 2 hereof.

The initial Supplemental Amount less the amount of reduction shall be referred to as the Supplemental Amount.

3.    Upon the occurrence of either of the following events, Dealer shall owe to Seller as of the date of the occurrence to Supplemental Amount, as determined with paragraph 2 above, which amount shall be paid to Seller within thirty (30) days of said date:

    (a)    The Station, for any reason, ceases to be branded pursuant to the Dealer Supply Agreement(s) unless Dealer, with Seller's consent, substitutes a station with comparable volume; or

    (b)    The Dealer Supply Agreement(s) is terminated (other than as a result of an uncured default by Seller thereunder) or expires for any reason, without execution of a renewal Dealer Supply Agreement, unless the Dealer Supply Agreement(s) is terminated by Seller due to a market withdrawal.

In addition, Haidar gave BP a mortgage on the property as security. The mortgage states in relevant part:

1.    This mortgage secures all of Mortgagor's [Haidar's] obligations relating ro or arising out of the Supplemental Agreement, including, without limitation, Mortgagor's obligation to purchase a certain number of gallons of branded motor fuel within the time period specified in the Supplemental Agreement, and to pay all monies which may become due from Mortgagor to Mortgagee in connection with such purchase, and only upon the occurrence of certain events specified in the Supplemental Agreement, to pay Mortgagee a Supplemental Amount specified therein. The initial Supplemental Amount specified in the Supplemental Agreement is One Hundred Eighty-nine Thousand and no/100 U.S. Dollars ($189,000.00). All monies which may become due hereunder by Mortgagor to Mortgagee

>   shall be due and payable on the date same is due pursuant to the Supplemental Agreement and the Dealer Supply Agreement.

B.

In 2003, BP made at least twelve deliveries of gasoline to Haidar on an open account for which Haidar failed to pay. As a result, on July 15, 2003, BP placed Haidar's account on a pre-pay status. During this time, Haidar's gasoline orders became, according to BP, "highly irregular." For instance Haidar did not order gasoline from BP between July 14, 2003 and August 6, 2003 and September 27, 2003 to November 3, 2003 yet continued to sell gasoline during these time periods.

On November 10, 2003, BP sent Haidar a letter requesting that it present "all tank and meter reconciliation records, bills of lading, invoices, and delivery records regarding your receipt, storage, distribution, and sale of motor fuel at Station 202 for the time period of July 1, 2003 - November 3, 2003 by no later than **Wednesday, November 19, 2003**. (Emphasis in original). BP stated that if Haidar failed to respond, BP would terminated the Dealer Supply Agreement and also stated that if no response is received, it would "assume that you failure to cooperate in this matter establishes that you have been selling non-BP product under our Trade Identities."

Haidar did not provide an explanation.

On December 2, 2003, BP sent Haidar a letter giving notice that BP "does hereby cancel, terminate and nonrenew the Dealer Supply Agreement and any attendant franchise relationship effective **Monday, December 8, 2003**." (Emphasis in original). On December 8, 2003, BP terminated the franchise and removed its trade identities from the property.

5

C.

BP says that Haidar has continued to sell gasoline on the property in violation of the Use Restriction contained in the deed.  On December 22, 2003, BP demanded that Haidar stop all sales of gasoline and any other activities that "violate the Use Restriction contained in the Deed and other documents" executed by the parties.

On February 19, 2004, BP filed a complaint against Haidar claiming breach of contract and violation of use restriction.

On March 11, 2004, BP reiterated its request that Haidar stop selling gasoline. Haidar, however, continues to sell gasoline on the property.  BP filed a motion for a temporary restraining order and preliminary injunction on March 18, 2004.  The parties appeared for a hearing on April 29, 2004 at which time the Court consolidated the request for injunctive relief with a trial on the merits and set the matter for a bench trial on May 10, 2004.  The parties also indicated on the record that Haidar was in the process of obtaining a buyer of the station; Haidar also admitted to selling non-BP gasoline at the station.  On May 10, 2004, the Court conducted a bench trial.  On May 26, 2004, the Court entered a Permanent Injunction Order prohibiting Haidar from selling gasoline at the station as a violation of the Use Restriction in the Covenant Deed.  The permanent injunction is set to expire on September 28, 2016.

BP says that Haidar continued to violate the Use Restriction, apparently by selling gasoline.  BP therefore filed a motion to enforce the permanent injunction order. At a hearing on July 27, 2004, the Court stated that Haidar had five days to comply or be held in contempt.  BP says that Haidar ultimately complied with the permanent injunction order.

BP then filed the instant motion for summary judgment seeking $182,168.34 as the amount due and owing based on the Supplemental Agreement.

### III. Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50. Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must

prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52).  The Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).  Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact.  See Anderson, 477 U.S. at 255.  Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted.  Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

## IV.  Analysis

### A.  Parties' Arguments

BP argues that it is entitled to a judgment of $182,168.34 under the Supplemental Agreement because it is undisputed that BP terminated the Dealer Supply Agreement on December 8, 2003 based on Haidar's violation of the Use Restriction.  This is an event listed in paragraph 3 of the Supplemental Agreement which triggers Haidar's liability.  Accordingly, the amount due and owing as calculated by paragraph 2 of the Supplemental Agreement is $182,168.34.  See BP's Exhibit G, Declaration of Paul Christensen.

Haidar says that it does not owe BP any money under the Supplemental Agreement because that agreement was not part of the purchase of the property, only the Offer contains the purchase price.  The Supplemental Agreement is about the purchase of gasoline.  Haidar says there is a genuine issue of material fact as to the origin of the debt.  Thus, summary judgment is not appropriate on a claim that the monies are owed for sale of the real property.

Haidar also argues that the monies alleged to be owed are being paid by a new dealer at the station. Haidar says he found a new owner and upon information and belief, the new owner is now operating the station as a BP station. Haidar says that the new owner entered into a Supplemental Agreement which mitigates BP damages because BP executed a renewal Dealer Supply Agreement with the new owner.

B. Conclusion

BP's position is well-taken. First of all, Haidar's argument that the Supplemental Agreement does not relate to the purchase of the property is misguided. The Supplemental Agreement was part of the series of documents evidencing the transaction between the parties. The Supplemental Agreement expressly states that BP agreed to sell and Haidar agreed to purchase the real property "for the amount stated in the Contract [Offer] and other material consideration consisting of Dealer's agreement to" enter into the Supplemental Agreement and the Dealer Supply Agreement. The Offer also states that in addition to the payment at closing, the consideration for the sale included Haidar's agreement to the terms of the Supplemental Agreement, which was attached to the Offer, as well as a mortgage securing the obligation under the Supplemental Agreement. Paragraph 3 of the Offer states:

> 3. DEALER RELATIONSHIP. Buyer and Seller acknowledge the existence of that certain Dealer Lease and Supply Agreement and exhibits and ancillary agreements thereto ("Dealer Lease") between them pursuant to which Buyer is currently operating a BP Amoco-branded service station at the Property. At closing, the parties shall execute a Mutual Cancellation Agreement in the form attached hereto as Exhibit D mutually canceling the Dealer Lease. At Closing, the parties shall further execute (a) Seller's standard from Dealer Supply Agreement ("Supply Agreement"), (b) **a Supplemental Agreement in the form attached hereto as Exhibit E ("Supplemental Agreement")**, and (c) if requested by Seller, a Mortgage

9

> as defined in the Supplemental Agreement, **it being an integral part of the consideration owed from buyer to Seller in entering into and Closing this transaction that, after Closing, Buyer shall operate the Property in accordance with the Supply Agreement, the Supplemental Agreement (and any Mortgage) and this Agreement** ....

(Emphasis added). Thus, Haidar's argument that his is only obligated to BP for the purchase price in the Offer is plainly contradicted by the language of the Offer itself. Haidar explicitly agreed to be bound by the terms of the Supplemental Agreement as part of consummating the transaction between the parties. There is no genuine issue of material fact as whether Haidar is bound by the Supplemental Agreement. Haidar's argument that he never actually received $189,000.00 from BP is based on the mistaken notion that the Supplemental Agreement is not part of the transaction. It was.

Secondly, Haidar's argument based on his belief that a new dealer has assumed his obligations under the Supplemental Agreement also fails.[1] BP denies that the new dealer has assumed Haidar's obligations to BP under the Supplemental Agreement or that BP agreed to a novation or a renewal agreement. There simply is no evidence to support Haidar's assertion. Nowhere in the Supplemental Agreement does it state that Haidar's liability is mitigated in the event that BP enters into a dealer relationship with a third party.

Finally, Haidar's argument that the Supplemental Agreement only required that there be a Dealer Supply Agreement is contradicted by the language of the Supplemental Agreement. The Supplemental Agreement says that Haidar is liable to

---

[1] As BP points out, Haidar's assertions regarding a new dealer are contained in his affidavit which is not signed or sworn. As such, it is not properly in evidence for consideration on summary judgment. See U.S. Structures, Inc. v. J.P. Structures, Inc., 130 f.3d 1185, 1189 (6th Cir. 1997).

BP in the event the Dealer Supply Agreement is terminated or expires "without execution of a renewal Dealer Supply Agreement." There was no such renewal with Haidar and it is undisputed that the Dealer Supply Agreement was terminated.

Simply put, the record shows that Haidar is liable under the Supplemental Agreement. BP has calculated the amount due and owing of $182,168.34. Haidar has not challenged BP's calculations. BP is entitled to a judgment in the amount requested.

SO ORDERED.

Dated:  July 1, 2005
                            s/Avern Cohn
                            AVERN COHN
                            UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was sent to counsel of record on this date, July 1, 2005, by electronic and/or ordinary mail.

                            s/Julie Owens
                            Case Manager, (313) 234-5160